826 F.2d 1074
 264 U.S.App.D.C. 58
 CLARK-COWLITZ JOINT OPERATING AGENCY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
People of the State of California, et al., Pacific Power &
Light Company, Edison Electric Institute, Sacramento
Municipal Utility District, et al., Pacific Gas & Electric
Company, Public Utility Commissioner of the State of Oregon,
Washington State Department of Fisheries, et al., American
Paper Institute, Inc., City of Santa Clara, California, et
al., American Public Power Association, Intervenors.
 No. 83-2231.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued En Banc March 31, 1986.
Decided Aug. 11, 1987.
 
 Petition for Review of an Order of the Federal Energy Regulatory commission.
 Christopher D. Williams, with whom Robert L. McCarty and George H. Williams, Jr., Washington, D.C., were on the brief, for petitioner.
 Jerome M. Feit, Sol., F.E.R.C., with whom William H. Satterfield, Gen. Counsel, Joseph S. Davies and John N. Estes, III, Attys., F.E.R.C. were on the brief, for respondent. Arlene P. Groner, Atty., F.E.R.C., Washington, D.C., also entered an appearance for respondent.
 Thomas H. Nelson, Portland, Or., for intervenor, Pacific Power & Light Co., Hugh Smith, Portland, Or., also entered an appearance for intervenor.
 Janice E. Kerr, J. Calvin Simpson and Peter G. Fairchild, San Francisco, Cal., were on the brief for intervenors, People of the State of California, et al.
 
 
 1
 James B. Liberman, Ira H. Jolles and Peter B. Kelsey, Washington, D.C., were on the brief for intervenor, Edison Elec. Institute.
 
 
 2
 Robert C. McDiarmid, Daniel I. Davidson, Frances E. Francis, Ben Finkelstein, G. Philip Nowak and Charles H. Cochran, Washington, D.C., were on the joint brief for public intervenors, Sacramento Mun. Utility Dist., et al.
 
 
 3
 Robert Ohlbach and Jack F. Fallin, Jr., San Francisco, Cal., were on the brief for intervenor, Pacific Gas & Elec. Co. Malcolm H. Furbush, San Francisco, Cal., also entered an appearance, for intervenor.
 
 
 4
 W. Benny Won, Salem, Or., was on the brief for intervenor, Public Utility Commissioner of Oregon.
 
 
 5
 Rigdon H. Boykin, New York City, was on the brief for intervenor, American Paper Institute, Inc.
 
 
 6
 Richard K. Willard, Asst. Atty. Gen. and Michael Kimmel, Atty., Dept. of Justice, Washington, D.C., were on the brief for amicus curiae, U.S., urging affirmance.
 
 
 7
 James M. Johnson, Olympia, Wash., entered an appearance for intervenor, Washington State Dept. of Fisheries, et al.
 
 
 8
 Frederick H. Ritts, Washington, D.C., entered an appearance for intervenor, American Public Power Ass'n.
 
 
 9
 Before ROBINSON, MIKVA, EDWARDS, RUTH B. GINSBURG, BORK, SCALIA*, STARR and BUCKLEY, Circuit Judges, and WRIGHT**, Senior Circuit Judge.
 
 
 10
 Opinion for the Court filed by Circuit Judge STARR.
 
 
 11
 Dissenting opinion filed by Circuit Judge MIKVA, with whom Circuit Judges ROBINSON and EDWARDS join.
 
 STARR, Circuit Judge:
 
 12
 This case involves a contest for a license to operate a hydroelectric power plant in the Pacific Northwest. The legal issues generated by the contest, however, far transcend the question of which of two competitors will win the right to operate the plant in question. To the contrary, the case involves fundamental issues of the power of an administrative agency to change its interpretation of law and to take regulatory action based upon that new interpretation.
 
 
 13
 The specific issue before us is whether in competing for a license, a public entity, the Clark-Cowlitz Joint Operating Agency, was entitled to the municipal (and State) preference prescribed in section 7(a) of the Federal Power Act, 16 U.S.C. Sec. 800(a) (1982).[1] The Federal Energy Regulatory Commission determined that Congress did not intend the statutorily prescribed municipal preference to apply in relicensing proceedings in which, as here, the incumbent licensee was competing for the license. In reaching this determination, however, FERC overruled its contrary conclusion articulated only three years earlier in declaratory proceedings in which both Clark-Cowlitz and the incumbent licensee, Pacific Power & Light Company, participated.
 
 
 14
 The petitioner here, Clark-Cowlitz, contends that the Commission acted unlawfully in accomplishing this about-face as to parties who participated in the earlier declaratory proceedings. Initially, we are called upon to decide whether principles of preclusion or retroactivity bar FERC from applying its reinterpretation of section 7(a) in the contest between Clark-Cowlitz and Pacific Power. If we conclude that FERC is not barred, then we must consider whether FERC's new interpretation is permissible under the principles enunciated in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). See also Immigration & Naturalization Service v. Cardoza-Fonseca, --- U.S. ----, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). For the reasons that follow, we hold that FERC was not precluded from applying its new interpretation of section 7(a) in the present proceeding. We also uphold its interpretation as reasonable and consistent with Congressional intent. One aspect of the Commission's substantive analysis, however (apart from statutory interpretation), falls short of the standards of reasoned decision making and thus requires a remand of the case to the agency.
 
 
 15
 * The relevant facts can be briefly stated. Pacific Power & Light Company is the incumbent licensee of the Merwin Hydroelectric Power Project. That facility is situated on the Lewis River in the State of Washington, between the Counties of Clark and Cowlitz. Pacific Power has owned, operated, and maintained the Merwin project since 1941, when Pacific Power's predecessor transferred the 50-year license originally issued in 1929 for the project to the investor-owned utility. Anticipating the looming expiration of the original license, Pacific Power filed an application for a new license in 1976. Shortly thereafter, public utility districts in Clark and Cowlitz Counties formed the Clark-Cowlitz Joint Operating Agency to compete for the Merwin license. Clark-Cowlitz filed its competing application in 1977, claiming the benefit of the municipal preference of section 7(a).
 
 
 16
 At that time, the original licenses for many other hydroelectric projects were likewise about to expire. A common issue arose as to whether States and municipalities contending for new licenses at the various projects could claim the benefit of section 7(a)'s municipal preference when incumbent licensees also sought new licenses for the projects. In view of the recurring nature of this issue, FERC decided to address the question in a declaratory order proceeding. See 5 U.S.C. Sec. 554(e) (1982). Numerous parties, including Clark-Cowlitz and Pacific Power, intervened and participated in that proceeding. Then, in an opinion issued in 1980, FERC concluded that the section 7(a) municipal preference applied in all relicensing proceedings, including those in which incumbent licensees were competing to maintain authority to operate their respective projects. City of Bountiful, 11 F.E.R.C. p 61,337, at 61,706, reh'g denied, 12 F.E.R.C. p 61,179, at 61,459 (1980).
 
 
 17
 Not surprisingly, FERC's decision failed to win universal acclaim. No less than thirty-eight petitioners appealed the agency's decision in the Bountiful declaratory order proceeding to the Eleventh Circuit. That court reviewed FERC's interpretation of section 7(a) under the deferential standard that " 'the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong.' " Alabama Power Co. v. FERC, 685 F.2d 1311, 1318 (11th Cir.1982) (quoting CBS, Inc. v. FCC, 453 U.S. 367, 382, 101 S.Ct. 2813, 2823, 69 L.Ed.2d 706 (1981)), cert. denied, 463 U.S. 1230, 103 S.Ct. 3573, 77 L.Ed.2d 1415 (1983). Under this standard of "great deference," the court upheld FERC's interpretation as "consistent with the statute's language, structure, scheme, and available legislative history." Id.[2] The Eleventh Circuit's opinion issued in September 1982.
 
 
 18
 As the Bountiful litigation proceeded in Atlanta, however, back in Washington, D.C., FERC was busily re-evaluating its stance on the applicability of the municipal preference. The Commission ultimately concluded that its Bountiful interpretation was contrary to Congressional intent, and that the preference did not apply when, in addition to a state or municipal applicant, the incumbent licensee sought a new license for an existing project. The first notice of this reassessment appeared in a brief filed by the Solicitor General in the United States Supreme Court on the petition for certiorari in Alabama Power. See Brief for the Federal Energy Regulatory Commission on Petitions for a Writ of Certiorari at 8-9, Utah Power & Light Co. v. FERC, 463 U.S. 1230, 103 S.Ct. 3573, 77 L.Ed.2d 1415 (1983), Joint Appendix ("J.A.") at 95, 106-07. There, the Solicitor General urged the Court, in light of FERC's reinterpretation, to grant the petitions and remand the case to the Eleventh Circuit. The Court, however, declined the invitation and denied certiorari. Utah Power & Light Co. v. FERC, 463 U.S. 1230, 103 S.Ct. 3573, 77 L.Ed.2d 1415 (1983).
 
 
 19
 At this juncture in the rather baroque history of the municipal preference issue, we return from the Bountiful litigation and rejoin Clark-Cowlitz in its efforts before the Commission to secure the Merwin license. Following FERC's decision in Bountiful, Clark-Cowlitz, along with numerous applicants for licenses at other sites, pressed FERC to begin hearings on individual projects. As luck would have it, hearings on the Merwin relicensing were the first out of the gate; indeed, those hearings got underway only three days after the Eleventh Circuit affirmed Bountiful. To Clark-Cowlitz's chagrin, however, in ultimately ruling on the Merwin applications, FERC formally announced its change of mind signalled in the Solicitor General's brief before the Supreme Court. The Commission expressly overruled Bountiful and awarded the license to Pacific Power, the delighted incumbent. Pacific Power & Light Co., 25 F.E.R.C. p 61,052, at 61,174, reh'g denied, 25 F.E.R.C. p 61,290 (1983) [hereinafter Merwin ].
 
 
 20
 In addition to repudiating Bountiful, FERC went on to evaluate the specific plans of the two contestants for the Merwin license. The Commission found that even under Bountiful the municipal preference would not obtain in the Merwin proceedings because Clark-Cowlitz's and Pacific Power's plans were not "equally well adapted," the statutory condition precedent to applying the preference. See supra note 1. The Commission based this finding on the relative economic impact of awarding the license to one contestant or the other. Specifically, the Commission determined that Pacific Power would incur greater costs in securing an alternative to Merwin Project power than would Clark-Cowlitz. Under this analysis, Pacific Power's customers, in the aggregate, would therefore suffer more if the incumbent lost the license than Clark-Cowlitz's would gain were Clark-Cowlitz to receive it. This meant, as FERC saw it, that Pacific Power's plans for operating Merwin were better adapted to "utilize in the public interest the water resources of the region." 16 U.S.C. Sec. 800(a) (1982) see supra note 1.
 
 
 21
 Clark-Cowlitz thereupon brought this appeal. See 16 U.S.C. Sec. 825l(b). While the appeal was pending, Congress amended section 7(a) of the Federal Power Act to eliminate the municipal preference in all relicensings except the Merwin proceedings. Electric Consumers Protection Act of 1986 (ECPA), Pub. L. No. 99-495, Secs. 2, 11, 100 Stat. 1243, 1255.[3] What had thus shaped up in this litigation as a major confrontation between the advocates of public power projects, on the one hand, and the champions of private (albeit regulated) enterprise on the other, reduced on the surface to an important but nonetheless parochial struggle over the license rights to a particular project. But Congress' amendment of the statutory prescription governing new licenses for existing projects, by keeping alive the Merwin controversy, did nothing to resolve the fundamental question as to an agency's ability to change its mind about the law and to act upon its new interpretation. It is to that bedrock issue of administrative law, brought into sharp relief by this case, that we now turn.
 
 II
 
 22
 Clark-Cowlitz's primary argument is that principles of res judicata or collateral estoppel bar FERC from applying its present interpretation of section 7(a) in the struggle between the two contestants. Clark-Cowlitz reasons that FERC is bound by the interpretation embraced in the Bountiful declaratory proceeding, to which both contestants for the Merwin license were parties (as intervenors).
 
 
 23
 For us to resolve this issue, it is unnecessary to plumb the depths of res judicata and collateral estoppel and their modern avatars, claim preclusion and issue preclusion. They have received lengthy expatiation elsewhere. See, e.g., Migra v. Warren City School District Board of Education, 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 984, n. 1, 79 L.Ed.2d 56 (1984); Nevada v. United States, 463 U.S. 110, 128-31, 103 S.Ct. 2906, 2917-19, 77 L.Ed.2d 509 (1983); Synanon Church v. United States, 820 F.2d 421, 424-25, 426-27 (D.C.Cir.1987); Carr v. District of Columbia, 646 F.2d 599 (D.C.Cir.1980); 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Secs. 4401-4478 (1981). Suffice it to say that, in general, these doctrines are designed to invest judicial resolutions of legal controversies with finality. See, e.g., Montana v. United States, 440 U.S. 147, 153-54, 99 S.Ct. 970, 973-74, 59 L.Ed.2d 210 (1979). Examined in light of preclusion principles, Clark-Cowlitz's argument is flawed in two fatal respects.
 
 
 24
 First. Whether it travels under the rubric of issue or claim preclusion, Clark-Cowlitz's argument fails because it misreads the Eleventh Circuit's decision as having conclusively determined the same issue (or claim) that confronts us. A fundamental requisite of issue preclusion is an identity of the issue decided in the earlier action and that sought to be precluded in a later action. Similarly, to preclude a party's raising a claim, it must be shown that the claim was (or could have been) raised in a prior proceeding. See, e.g., Gould v. Mossinghoff, 711 F.2d 396, 398-99 (D.C.Cir.1983); see also Jack Faucett Associates, Inc. v. American Telephone & Telegraph Co., 744 F.2d 118, 124 (D.C.Cir.1984), cert. denied, 469 U.S. 1196, 105 S.Ct. 980, 83 L.Ed.2d 982 (1985). The Second Restatement of Judgments makes clear the importance of these related requirements:
 
 
 25
 The principle underlying the rule of claim preclusion is that a party who once has had a chance to litigate a claim before an appropriate tribunal usually ought not to have another chance to do so. A related but narrower principle--that one who has actually litigated an issue should not be allowed to relitigate it--underlies the rule of issue preclusion.
 
 
 26
 Restatement (Second) of Judgments at 6 (1982) (emphasis added); see also Montana v. United States, 440 U.S. at 153, 99 S.Ct. at 973.
 
 
 27
 In the case at hand, the Eleventh Circuit neither addressed nor had the opportunity to address the specific issue (or claim) before us, namely the propriety of FERC's present, anti-Bountiful view that the municipal preference does not obtain in relicensings to which the incumbent licensee is a party. See I.A.M. National Pension Fund v. Industrial Gear Manufacturing Co., 723 F.2d 944, 947-49 (D.C.Cir.1983) (preclusion does not attach to issues not necessarily litigated or claims that could not have been raised in earlier proceeding). The Eleventh Circuit was, instead, called upon to assess the reasonableness of FERC's view enunciated in the short-lived Bountiful decision, namely that the preference applied in all relicensings. Its decision that Bountiful was both consistent with the statute and otherwise reasonable does not, as a matter of law or logic, resolve the distinct issue of whether FERC's recent interpretation is also reasonable and in accordance with the statute.[4] It should go without saying that an ambiguous or broadly worded statute may admit of more than one interpretation that is reasonable and consistent with Congressional intent. See, e.g., Japan Whaling Association v. American Cetacean Society, --- U.S. ----, 106 S.Ct. 2860, 2867, 92 L.Ed.2d 166 (1986); Chevron v. NRDC, 467 U.S. at 863-64, 104 S.Ct. at 2792; Chisholm v. FCC, 538 F.2d 349, 364 (D.C.Cir.), cert. denied, 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976); see also Office of Communication of the United Church of Christ v. FCC, 590 F.2d 1062, 1068-69 (D.C.Cir.1978); cf. ICC v. American Trucking Associations, Inc., 467 U.S. 354, 363-64 n. 7, 104 S.Ct. 2458, 2463-64 n. 7, 81 L.Ed.2d 282 (1984); Immigration & Naturalization Service v. Jong Ha Wang, 450 U.S. 139, 144-45, 101 S.Ct. 1027, 1031, 67 L.Ed.2d 123 (1981). That is to say, there may be more than one "right" interpretation if Congress has painted with a broad (or at least non-specific) brush so as to permit an agency flexibility in carrying out its duties.
 
 
 28
 Second. Another ground on which the municipality's preclusion argument founders is that Clark-Cowlitz and FERC were fellow travelers in the Bountiful proceeding. Both advanced the position, now rejected by FERC, that the municipal preference applies in all relicensings. Issue preclusion, however, attaches only to such issues as the parties litigated adversely to each other in the prior litigation. See, e.g., Jack Faucett, 744 F.2d at 125; Restatement (Second) of Judgments Sec. 38. Similarly, as to claim preclusion, FERC's successfully defending its position (at that time) in Alabama Power does not bar it from asserting a different position in the current proceedings. See, e.g., I.A.M. National Pension Fund, 723 F.2d at 945 & n. 1. All that is precluded by virtue of FERC's earlier success is another action by the petitioners in Alabama Power, among whom Clark-Cowlitz was of course not to be found (being, indeed, on the opposite side), on the claim of Bountiful 's invalidity. See Nevada v. United States, 463 U.S. at 134-35, 103 S.Ct. at 2920; Restatement (Second) of Judgment Sec. 19.
 
 
 29
 In summary, preclusion principles do not foreclose FERC's applying a reinterpretation of section 7(a) in the Merwin proceedings.[5] The Court of Appeals' decision in Alabama Power did not address the issue of the propriety of FERC's present interpretation, nor could the claim that this agency interpretation was invalid have been raised before the Eleventh Circuit.
 
 III
 
 30
 Since the interpretation of section 7(a) that FERC first applied in the contest between Pacific Power and Clark-Cowlitz represented a reversal of the position the Commission had espoused in Bountiful, it is appropriate for us to consider whether the application of its change in position was consistent with principles of retroactivity. We are persuaded that it was.
 
 
 31
 In this circuit, Retail, Wholesale & Department Store Union v. NLRB, 466 F.2d 380 (D.C.Cir.1972), provides the framework for evaluating retroactive application of rules announced in agency adjudications. See Local 900, International Union of Electrical, Radio & Machine Workers v. NLRB, 727 F.2d 1184, 1194-95 (D.C.Cir.1984); see also Yakima Valley Cablevision, Inc. v. FCC, 794 F.2d 737, 746 & n. 35 (D.C.Cir.1986). The general principle is that when as an incident of its adjudicatory function an agency interprets a statute, it may apply that new interpretation in the proceeding before it. See NLRB v. Wyman-Gordon, 394 U.S. 759, 765-66, 89 S.Ct. 1426, 1429, 22 L.Ed.2d 709 (1969) (plurality opinion); see also NLRB v. Bell Aerospace Co., 416 U.S. 267, 294-95, 94 S.Ct. 1757, 1771-72, 40 L.Ed.2d 134 (1974); Thorpe v. Housing Authority of the City of Durham, 393 U.S. 268, 282, 89 S.Ct. 518, 526, 21 L.Ed.2d 474 (1969); McDonald v. Watt, 653 F.2d 1035, 1042 (5th Cir.1981) ("While at one time the determination that a rule was properly established in adjudication would have compelled the conclusion that it should be applied with full retroactive effect, the accepted rule today is that in appropriate cases the court may in the interest of justice make the rule prospective."); 4 K. Davis, Administrative Law Treatise Sec. 20:8, at 30 (2d ed. 1983) ("[A]n agency having rulemaking power is forbidden by ... Wyman-Gordon to make new law in an adjudication if it is to be limited to prospective effect."); Tennessee Gas Pipeline Co. v. FERC, 606 F.2d 1094, 1114, 1115 (D.C.Cir.1979) (reading Bell Aerospace as affording an agency "broad discretion to announce policy in adjudication ... subject to an exception in a case of severe impact and justifiable reliance on contrary agency pronouncements"), cert. denied, 445 U.S. 920, 100 S.Ct. 1284, 63 L.Ed.2d 605 (1980); cf. Mullins v. Andrus, 664 F.2d 297, 302-03 (D.C.Cir.1980) ("[J]udicial decisions normally are to be applied retroactively.") (footnote omitted); National Association of Broadcasters v. FCC, 554 F.2d 1118, 1130 (D.C.Cir.1976) ("The general rule of long standing is that judicial precedents normally have retroactive as well as prospective effect.").
 
 
 32
 Nevertheless, a retrospective application can properly be withheld when to apply the new rule to past conduct or prior events would work a "manifest injustice." See Thorpe, 393 U.S. at 282, 89 S.Ct. at 526. The Retail, Wholesale court set forth a non-exhaustive list of five factors to assist courts in determining whether to grant an exception to the general rule permitting "retroactive" application of a rule enunciated in an agency adjudication:
 
 
 33
 (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.
 
 
 34
 Id. at 390.
 
 
 35
 The first factor of Retail, Wholesale recognizes that "a number of reasons call[ ] for the application of a new rule to the parties to the adjudicatory proceeding in which it is first announced." Id.; see also Local 900, 727 F.2d at 1195. For one thing, by granting the benefit of a change in the law to those whose efforts may have helped bring about the change, retroactive application of a new principle encourages parties to "advance new theories or ... challenge outworn doctrines." Retail, Wholesale, 466 F.2d at 390. For another, the Administrative Procedure Act generally contemplates that when an agency proceeds by adjudication, it will apply its ruling to the case at hand; when, on the other hand, it employs rulemaking procedures, its orders ordinarily are to have only prospective effect. See 5 U.S.C. Secs. 551(4)-(7), 553, 554; see also Wyman-Gordon, 394 U.S. at 764, 89 S.Ct. at 1429. Inasmuch as Merwin was the first proceeding in which FERC announced its reinterpretation, the first Retail, Wholesale factor points in favor of retroactive application.[6]
 
 
 36
 The second factor requires the court to gauge the unexpectedness of a rule and the extent to which the new principle serves the important but workaday function of filling in the interstices of the law. It implicitly recognizes that the longer and more consistently an agency has followed one view of the law, the more likely it is that private parties have reasonably relied to their detriment on that view. See, e.g., Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 495-502, 88 S.Ct. 2224, 2232-36, 20 L.Ed.2d 1231 (1968); see also NLRB v. Majestic Weaving Co., 355 F.2d 854, 861 (2d Cir.1966). But here, FERC's prior interpretation of section 7(a) cannot in reason rise to the level of a "well established practice." For one thing, application of the prior interpretation was never a "practice." Bountiful was, after all, FERC's sole pronouncement on an issue that had lain dormant for almost fifty years. Indeed, the entire purpose of the declaratory order proceeding was to provide a forum for resolving this emerging issue. For another thing, the Commission's ruling in that solitary proceeding can scarcely be viewed as "well established." The reader will recall that judicial review of Bountiful had not even concluded when FERC changed its mind as to the meaning of section 7(a).[7]
 
 
 37
 Now it is true that, by virtue of Bountiful 's existence, FERC was not "required by the very absence of a previous standard" to confront the issue raised in Merwin and to supply a rule. Retail, Wholesale, 466 F.2d at 391. The second factor thus favors retrospective application less than would be the case in situations where formulation of a rule is necessary to "fill[ ] in the interstices of the [statute]," id. (quoting SEC v. Chenery, 332 U.S. at 202-03, 67 S.Ct. at 1580). On the other hand, FERC's need to apply its reinterpretation in Merwin was more compelling than those in which an agency shifts its position solely as a result of a change in agency policy. Here, FERC was animated by the conviction that its prior interpretation thwarted Congressional intent; to make bad matters worse, the prospect loomed that an erroneous interpretation would be locked in for a generation, embodied in licenses that would last well into the Twenty-First Century. See Chisholm v. FCC, 538 F.2d at 364 (agency's discretion to change its course is broader when agency believes its prior course is contrary to statutory design); see also Chenery, 332 U.S. at 203, 67 S.Ct. at 1581 ("[R]etroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design ..."). On balance, it seems to us that the second factor weighs against granting an exception to the general rule of retrospective application.
 
 
 38
 Next, in evaluating possible reliance on Bountiful, we can see little if any period during which Clark-Cowlitz would reasonably have relied on FERC's earlier interpretation. Both the formation of Clark-Cowlitz and its initial efforts toward securing the Merwin license occurred before Bountiful was rendered, at a time when the applicability of the municipal preference to relicensing proceedings had not been resolved.[8] Obviously, no reliance could have preceded Bountiful. Thereafter, Clark-Cowlitz might optimistically have viewed Bountiful 's interpretation as at least tentatively settled after the Eleventh Circuit's favorable decision. But, upon analysis, a sanguine view as to Bountiful 's permanence would necessarily have been short-lived, for only six months elapsed between the Eleventh Circuit's decision in November 1982 and May 1983, when the Solicitor General revealed FERC's about-face. See FERC's Brief in Support of Petitions for Certiorari at 8-9, J.A. at 106-07. Any reliance on agency fidelity to Bountiful after this development would manifestly have been unreasonable, inasmuch as the agency had concluded (and announced) that its prior reading was wrong as a matter of law.[9]
 
 
 39
 In sum, viewed most favorably to Clark-Cowlitz, the period during which it could have relied on FERC's prior interpretation spanned no more than six months. Moreover, the presumably sunny prospects for Bountiful 's vitality during this brief period were beclouded in some measure by knowledge of possible Supreme Court review (or, at a minimum, the likelihood of an effort by the incumbent licensee and other private utilities to secure Supreme Court review). We have discovered no legal authority (nor do we see in logic any reason) to support carving out an exception to the rule of retroactivity based on reliance on an agency interpretation so briefly embraced. Cf. Retail, Wholesale, 466 F.2d at 387 & n. 17 (prior interpretation applied in numerous decisions over at least seven years). Although hope springs eternal, hope is no surrogate for reliance.
 
 
 40
 Clark-Cowlitz's situation fares no better under the fourth Retail, Wholesale factor, to wit, the degree of burden which a retroactive order imposes. As a result of FERC's change in interpretation, Clark-Cowlitz lost the benefit of what is admittedly a highly attractive procedural advantage in competing for a hydroelectric power license. Nevertheless, Clark-Cowlitz obviously retained the unfettered right to compete for the license. It was simply forced to do so on the same terms as non-municipal applicants, entitled to the license only if it proved that its plans were "best adapted to develop, conserve, and utilize in the public interest the water resources of the region." 16 U.S.C. Sec. 800(a). Thus, the situation "is not [one] in which some new liability is sought to be imposed on individuals for past actions which were taken in good-faith reliance on [agency] pronouncements. Nor are fines or damages involved here." Bell Aerospace, 416 U.S. at 295, 94 S.Ct. at 1772. Measured against the burdens weighed in other cases, the burden imposed on Clark-Cowlitz is, as we see it, marginal at best. Cf. Local 900, 727 F.2d at 1195 (upholding retroactive application that resulted in imposition of money damages).[10]
 
 
 41
 The fifth and final factor--the statutory interest in applying a new rule despite the reliance of a party on the old standard--likewise favors retrospective application. Withholding retroactive application would grant Clark-Cowlitz a 30-year benefit to which FERC now believes it is not entitled. The overriding Congressional interest in ensuring that the best qualified contestant (as FERC sees it) operate hydroelectric power projects, in other words, would not be fulfilled at the Merwin site for three decades.[11] This 30-year delay looms large when measured against whatever optimism Clark-Cowlitz may have felt during the six months between judicial affirmance of Bountiful and revelation of FERC's disavowal of that briefly held position.
 
 
 42
 In addition to application of the Retail, Wholesale analysis, we discern yet another consideration in favor of permitting FERC to apply its reinterpretation. To hold otherwise would grant Clark-Cowlitz the benefit of a municipal preference that Congress, by enacting the ECPA, has seen fit to deny to all other municipal applicants. Yet eight of these applicants had applications pending at the time when FERC announced its decision to overrule Bountiful. As a result of FERC's reassessment, eight other applicants suffered disappointment differing from that experienced by Clark-Cowlitz only by what appear to be evanescent shades of graduation. We can see nothing warranting the singling out of Clark-Cowlitz for this boon solely because its application was the first to proceed to the hearing stage.[12]
 
 
 43
 To the contrary, the more equitable approach would be to treat Clark-Cowlitz like the other similarly situated municipal applicants, which, no one disputes, can no longer claim the benefit of the municipal preference in the wake of the ECPA. See, e.g., Bradley v. School Board of the City of Richmond, 416 U.S. 696, 714-16, 94 S.Ct. 2006, 2017-18, 40 L.Ed.2d 476 (1974). And it should not go unnoticed that equal treatment is exactly what Clark-Cowlitz has been asking for all along, contending, for example, that it "and every other party [to Bountiful ] reasonably relied on the assertion of FERC" in Bountiful. Petitioners' Brief at 31.
 
 IV
 
 44
 This brings us at last to the substantive heart of the petition for review: the propriety in law of FERC's determination that no municipal preference applies in relicensing proceedings in which the incumbent licensee is seeking to remain on the project. Confronted with an agency's interpretation of the statute that Congress has charged it with administering, we must first employ the traditional tools of statutory construction to determine whether Congress has spoken directly to the precise question at issue. If Congress has not addressed the precise question, or if it has addressed the issue but done so ambiguously, the question becomes whether the agency's interpretation is a reasonable (or permissible) one. See, e.g., Cardoza-Fonseca, 107 S.Ct. at 1220-22; Chevron v. NRDC, 467 U.S. at 844, 104 S.Ct. at 2872; Rettig v. Pension Benefit Guaranty Corp., 744 F.2d 133, 141 (D.C.Cir.1984). Upon analysis of the statute, we are persuaded that Congress has not in this instance clearly and specifically addressed the role of the municipal preference in relicensings and that FERC's interpretation of section 7(a) should be upheld as reasonable.
 
 
 45
 The focus of this dispute is the language of two provisions of the Federal Power Act. Section 7(a) of the Act, 16 U.S.C. Sec. 800(a), which is set forth supra note 1, creates a preference for municipal applicants. It specifies three situations in which the preference applies: when the Commission is (1) "issuing preliminary permits" under section 5 of the Act, id. Sec. 798; see also id. Sec. 797(f); (2) "[issuing] licenses where no preliminary permit has been issued"; and (3) "issuing licenses to new licensees under section 808 of this title."
 
 
 46
 The third category of section 7(a) is the only one arguably applicable here because the proceedings before the Commission were relicensing proceedings carried out under section 15 of the Act, 16 U.S.C. Sec. 808, the provision to which section 7(a) makes express reference. Indeed, Clark-Cowlitz concedes that neither the first nor the second situation obtains here. Petitioner's Brief at 34. That, then, brings us to section 808 (section 15 of the Federal Power Act), which concerns relicensing proceedings. It provides in pertinent part as follows:(a) If the United States does not, at the expiration of the original license, exercise its right to take over, maintain, and operate any project or projects of the licensee, as provided in section 807 of this title, the commission is authorized to issue a new license to the original licensee upon such terms and conditions as may be authorized or required under the then existing laws and regulations, or to issue a new license under said terms and conditions to a new licensee, which license may cover any project or projects covered by the original license, and shall be issued on the condition that the new licensee shall, before taking possession of such project or projects, pay such amount, and assume such contracts as the United States is required to do in the manner specified in section 807 of this title: Provided, That in the event the United States does not exercise the right to take over or does not issue a license to a new licensee, or issue a new license to the original licensee, upon reasonable terms, then the commission shall issue from year to year an annual license to the then licensee under the terms and conditions of the original license until the property is taken over or a new license is issued as aforesaid.
 
 
 47
 Id.
 
 
 48
 FERC determined that the third (and final) situation described in the municipal preference clause of section 7(a) did not govern the proceedings before it. Merwin, 25 F.E.R.C. p 61,052. It reasoned that Pacific Power was an "original licensee," not a "new licensee," within the meaning of section 15. Under this analysis, the Commission was not "issuing [a] license[ ] to a new licensee," under section 7(a). Id. Sec. 800(a). Rather, it was issuing "a new licensee to the original licensee."
 
 
 49
 The Commission thus relied on the statutory distinction in section 15 between an "original licensee" and a "new licensee." Id. Sec. 808(a) (emphasis added). The Commission further found that this interpretation, mandated by the terms of sections 7 and 15, was inconsistent with neither the structure of the Act nor its legislative history. By virtue of this analysis, the Commission concluded that its contrary view in Bountiful was "legally erroneous." Having interpreted the municipal preference clause not to apply in relicensings involving "original licensees," the Commission considered the relevant standards to be contained in the second clause of section 7(a), which applies "as between other applicants." Id. Sec. 800(a). Thus, in FERC's view, any relicensing in which one of the applicants was an incumbent (or more precisely, "original") licensee was a proceeding "between other applicants."
 
 
 50
 In our view, the Commission's new interpretation (withholding the municipal preference in relicensing proceedings in which the original licensee is involved) represents a reasonable reading of the statute. Indeed, to embrace the contrary interpretation the reader must modify either the statute or the facts in one of two ways; (1) by characterizing Pacific Power, the incumbent, as a "new licensee" when it is in fact the "original licensee"; or (2) by rewording the provision to mandate application of the municipal preference when "entertaining applications for a license to a new license." 16 U.S.C. Sec. 800(a).
 
 
 51
 Both approaches do violence to the terms of the statute. The first ignores the distinction in section 808(a) between "original licensees" and "new licensees." Indeed, the first approach renders surplusage the concept of "original licensee," an act of judicial surgery which should be avoided when means are at hand to save the entire statute. See, e.g., Reiter v. Sonotone Corp., 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979); National Insulation Transportation Committee v. ICC, 683 F.2d 533, 537 (D.C.Cir.1982); In re Surface Mining Regulation Litigation, 627 F.2d 1346, 1362 (D.C.Cir.1980). The second approach ignores the fact that the provisions distinguish between "issuing" a license and "entertain[ing] applications for" a license. Compare id. Sec. 808(a) with id. Sec. 807(b).[13] Congress would, it seems to us, likely have employed the latter term in Sec. 800(a) had it intended to refer to the process of receiving applications for the issuance of a license to a new licensee.[14] Thus, compared to the competing interpretation championed by Clark-Cowlitz, FERC's reading has the substantial virtue of giving meaning to all of the words of the statute and depending only on the words that Congress employed in drafting it. See, e.g., United States v. Menasche, 348 U.S. 528, 538-39, 75 S.Ct. 513, 519-20, 99 L.Ed. 615 (1955); Market Co. v. Hoffman, 101 U.S. (11 Otto) 112, 115-16, 25 L.Ed. 782 (1879). In addition, FERC's approach construes the phrase "issu[ing] a license to a new licensee" in section 7 of the Act to have the same meaning as that phrase does in section 15, the provision expressly incorporated in section 7. Cf. Stafford v. Briggs, 444 U.S. 527, 535-36, 100 S.Ct. 774, 780, 63 L.Ed.2d 1 (1980); Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433, 52 S.Ct. 607, 609, 76 L.Ed. 1204 (1932).
 
 
 52
 On the other hand, the merit of FERC's present interpretation is not entirely free from doubt. Specifically, it is in tension with the opening phrase of the second clause of section 7(a), "as between other applicants."[15] Clark-Cowlitz's argument--that the municipal preference (in the first clause of section 7(a)) applies in any contest between a State or municipality and a private entity, and that the second clause applies "between other applicants," i.e., in relicensing proceedings between any two private entities, including original licensees--is not without force. This interpretation arguably gives a more natural reading to the phrase "between other applicants"; on the other hand, it suffers from the shortcomings adumbrated above.
 
 
 53
 Fortunately, we are not without guidance in this unhappy (but hardly unfamiliar) situation of plausible competing interpretations of statutes. The Supreme Court only recently reminded us that a court cannot substitute what it considers the "more natural" construction of an ambiguous statute for a reasonable interpretation advanced by an agency. See Young v. Community Nutrition Institute, 477 U.S. 974, 106 S.Ct. 2360, 2364-65, 90 L.Ed.2d 959 (1986); see also Cardoza-Fonseca, 107 S.Ct. at 1220 n. 29; Chevron v. NRDC, 467 U.S. at 842-44, 104 S.Ct. at 2781-82. Since it is beyond cavil that section 7(a) is reasonably susceptible to the interpretation proffered by FERC, we are duty bound to uphold it.
 
 
 54
 Nothing in the legislative history warrants upsetting this construction of the statute. As a general matter, the legislative history in this respect is not especially illuminating; indeed, the "legislative history here as usual is more vague than the statute we are called upon to interpret." United States v. Public Utilities Commission, 345 U.S. 295, 320, 73 S.Ct. 706, 720, 97 L.Ed. 1020 (1953) (Jackson, J., concurring); see also Burlington Northern Railroad Co. v. Oklahoma Tax Commission, --- U.S. ----, 107 S.Ct. 1855, 1859-60, 95 L.Ed.2d 404 (1987). It certainly points in no specific direction. On the one hand, the history favoring Clark-Cowlitz's position is, to quote the Eleventh Circuit's charitable characterization, "weak." Alabama Power Co., 685 F.2d at 1317. On the other hand, some portions of the history provide modest, albeit scarcely overpowering, support for FERC's present position.[16] But what does appear beyond question is that resort to the legislative history yields no "compelling indications" of the sort necessary to overturn an agency's reading that is in harmony with the express language of the legislation. See, e.g., Burlington Northern, 107 S.Ct. at 1860; Chemical Manufacturers Association v. Natural Resources Defense Council, Inc., 470 U.S. 116, 126, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985); CBS, 453 U.S. at 382, 101 S.Ct. at 2823; Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 565-68, 100 S.Ct. 790, 796-98, 63 L.Ed.2d 22 (1980); see also, e.g., Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). But cf. Board of Governors v. Dimension Financial Corp., 474 U.S. 361, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986).
 
 
 55
 Finally, FERC's interpretation accords with the broader purposes animating Congress, to the extent those purposes can fairly be discerned from the structure and terms of the statute itself. The statutory mechanism provides for long-term licenses, at the end of which the United States or a subsequent licensee may, in effect, "buy out" the original licensee. This approach recognizes the need on the part of private capital for stability and a return on investment, see, e.g., FPC v. Hope Natural Gas Co., 320 U.S. 591, 603, 605, 64 S.Ct. 281, 288, 289, 88 L.Ed. 333 (1944); Jersey Central Power & Light Co. v. FERC, 810 F.2d 1168, 1176 (D.C.Cir.1987), and, at the same time, the need to safeguard the public interest, which is, of course, the agency's raison d'etre. FERC's view of the limited circumstances in which the municipal preference is available is, we believe, consistent with this balancing of competing interests. Municipalities are entitled to a preference in relicensing over all other applicants when the incumbent licensee does not seek a new license. When, on the other hand, the original licensee seeks a renewed license, the municipality must show that it is better adapted than the incumbent if it is to unseat the original licensee. While the Act confers no "renewal expectancy," as is the case in the FCC's stewardship over broadcast licenses, neither does it, as the Commission reads the statute, obliterate 50 years of investment, improvement and administration of a project by conferring a special preference based entirely on the identity of the entity seeking to unseat the incumbent. Far from being an "absurd result," FERC's view of the statute appears reasonably to accommodate the public and private interests taken into account by the Act.
 
 V
 
 56
 Having determined that the Commission could properly jettison Bountiful and apply its new interpretation of section 7(a) in the contest between Clark-Cowlitz and Pacific Power, we confront two final, related issues: first, whether FERC could properly take into account the relative economic impacts of an award to one or the other contestant; and second, if so, whether the Commission's assessment of these impacts avoids the APA's proscription of "arbitrary" and "capricious" agency action. 5 U.S.C. Sec. 706(2)(A). We are satisfied that FERC may include in its deliberations consideration of the economic consequences of the grant of a license. We are unable to conclude, however, that FERC's consideration of those consequences in the Merwin proceedings passes muster as reasoned decision making.
 
 
 57
 * Under the standards governing review of agency interpretations of statutes, see supra text at 26, we have no difficulty in upholding FERC's interpretation as a permissible construction. As we have already discussed, FERC properly could, consistent with Chevron principles, consider the Merwin proceedings as arising under the latter half of section 7(a). That portion of the statute provides:
 
 
 58
 [A]s between other applicants, the Commission may give preference to the applicant the plans of which it finds and determines are best adapted to develop, conserve, and utilize in the public interest the water resources of the region, if it be satisfied as to the ability of the applicant to carry out such plans.
 
 
 59
 Although it is certainly arguable that the economic impacts of an award are not factors properly subsumed within consideration of competing applicants' plans, two aspects of the language support FERC's position that it was nonetheless permissible to consider these impacts. First, in contrast to the initial part of 7(a), the second half contains the permissive verb "may." To be sure, "may" can sometimes express the language of command. See, e.g., Commonwealth v. Lynn, 501 F.2d 848, 854 & n. 21 (D.C.Cir.1974); cf. Association of American Railroads v. Costle, 562 F.2d 1310, 1312 (D.C.Cir.1977). Nevertheless, the fact that Congress saw fit to employ "shall" in the first clause of section 7(a) powerfully suggests that the distinction has meaning--that its use of "may" in the second clause was intended to vest in FERC, in proceedings "between other applicants," the discretion to consider factors extrinsic to the applicants' plans. Cf. United States v. Hohri, --- U.S. ----, ----, 107 S.Ct. 2246, 2250, 96 L.Ed.2d 51 (1987). In addition, the second clause of section 7(a) does not, like the first, contain a provision permitting applicants under certain circumstances to modify their plans to be "equally well adapted" as those of competing applicants. The presence of this provision in the municipal preference clause tends to suggest that relicensing decisions under that clause should be based exclusively on the plans themselves. The absence of this provision in the second clause buttresses the Commission's view that in proceedings like the one at hand, section 7(a) does not force FERC to close its eyes to factors extrinsic to the plans of the license applicants.
 
 
 60
 Further support for the Commission's interpretation is found in section 10(a) of the Federal Power Act, which prescribes a broad public interest inquiry to guide the Commission in crafting conditions for licenses.[17] As FERC persuasively argues, the breadth of the public-interest inquiry permitted under section 10(a) should inform the interpretation of section 7(a)'s directions as to who should hold the license.
 
 
 61
 Finally, deferring to the Commission's expertise in technical, economic considerations is consistent with venerable case law interpreting sections 7 and 10 of the Act. See, e.g., National Hells Canyon Association v. FPC, 237 F.2d 777, 779-80 (D.C.Cir.1956), cert. denied, 353 U.S. 924, 77 S.Ct. 681, 1 L.Ed.2d 720 (1957) (noting that recurrence in sections 7(b) and 10(a) of the phrase "in the judgment of the Commission" emphasizes Commission's broad discretion); see also United States ex rel. Chapman v. FPC, 345 U.S. 153, 171, 73 S.Ct. 609, 619, 97 L.Ed. 918 (1953) (judgments about technical and economic issues committed to Commission's discretion).
 
 
 62
 In sum, we believe the Commission reasonably interpreted the statutes governing licensing of hydroelectric projects to permit considerations of the economic consequences of its award. We turn, then, to the Commission's application of this interpretation.
 
 B
 
 63
 In addition to attacking FERC's authority to take economic impacts into account, petitioner faults the Commission's assessment of these impacts. We are constrained to agree.
 
 
 64
 The Commission focused solely on the consequences of its decision on the customers of Pacific Power and Clark-Cowlitz. See Merwin, 25 F.E.R.C. at 61,196-201. Assessing the long-term impacts of the decision confronting it, FERC found that if it awarded the license to Clark-Cowlitz, Pacific Power would ultimately be forced to replace the lost Merwin power with much more expensive power, either from thermal generating facilities that Pacific Power would have to construct or from power supplied by the Bonneville Power Administration at its so-called "New Resources" rate. Id. at 61,197-98. In contrast, Clark-Cowlitz could, if it failed to obtain the Merwin license, service its customers with additional purchases from Bonneville at the latter's preferential "Priority Firm" rate. Thus, although precise calculation was impossible, it was clear that Pacific Power's alternative costs would greatly exceed those of Clark-Cowlitz. Moreover, in the short term, the decrease in Clark-Cowlitz's cost of power in the event of an award to it paled in comparison to the increased cost of power Pacific Power would incur in that event. Id. at 61,198. In general, the Commission found, these impacts would be passed along to customers of the two entities. Balancing the heavy cost increase that a significant portion of Pacific Power's customers would absorb as against the more modest benefits Clark-Cowlitz's would receive should the latter obtain the license, FERC determined to place the license in Pacific Power's hands. Id. at 61,201.
 
 
 65
 The Commission's analysis, upon reflection, overlooks important aspects of the problem before it. See Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). To be sure, the Commission rightly perceived that measurable dislocation would flow from unseating Pacific Power from the Merwin project. We also recognize the commonsense force of FERC's taking into account Clark-Cowlitz's access as a municipal entity to federally subsidized Bonneville power. Nevertheless, the Commission's truncated analysis raises as many questions as it answers.
 
 
 66
 For one thing, the Commission's analysis would appear invariably to favor the status quo and (other things being equal) all but guarantee an award to the incumbent licensee where a competing State or municipal applicant has preferential access to subsidized power. This seems to transmogrify the second clause of section 7(a)--which, as we have seen, contemplates an award to the best-suited applicant, regardless of identity--into a virtual per se (or at least strong) preference favoring the incumbent.
 
 
 67
 For another, the Commission's exclusive focus on the customers of the two contestants blinds it to economic ramifications meriting its consideration. Specifically, the Commission appears to have ignored the fact that an award to Clark-Cowlitz would (presumably) free up low rate ("Priority Firm") Bonneville power for other customers in the Pacific Northwest. Thus, countervailing the detriment to Pacific Power's customers was not only the benefit to Clark-Cowlitz's customers, but also the benefits presumably accruing to other power customers in the region. The third element of the equation, however, is entirely missing from the balance struck in the Commission's decision.
 
 
 68
 Finally, FERC's dispositive emphasis on the dislocation attendant to unseating an incumbent licensee appears not to take into account the fact that the energy needs of the region and available sources of power within the region remain constant regardless of which applicant ultimately secures Merwin license. It would seem, in other words, that shifting the control of a single power source in the region does not alter the energy landscape of the region. Subsidized Bonneville power will still exist even if Clark-Cowlitz uses less of that power and replaces it with power from the Merwin project. The benefits (in the form of lower rates) from Bonneville power will presumably remain and find their way to consumers in the region, albeit to different groups of consumers (depending obviously on which applicant receives the Merwin license).
 
 
 69
 Our observations in this respect should not, however, be misconstrued or overread. We emphatically do not require FERC to embrace any particular economic theory from the range of rational approaches. What we do require is that the Commission come to grips with the obvious ramifications of its approach and address them in a reasoned fashion.
 
 VI
 
 70
 To summarize our holding, we conclude that neither preclusion nor retroactivity principles prevented FERC from abandoning in the Merwin relicensing proceedings the interpretation of section 7(a) it adopted in Bountiful. Furthermore, this later interpretation is consistent with Congressional intent embodied in the Federal Power Act and is otherwise reasonable. We conclude, however, that the Commission's analysis of the relative economic impacts of its award of the Merwin license is insufficient to pass muster under the APA. We therefore remand this case to the Commission for further elucidation of its determination that Pacific Power's higher alternative costs justified awarding the license to it. Its order in all other respects is hereby affirmed. See 16 U.S.C. Sec. 825l (b).
 
 
 71
 Judgment Accordingly.
 
 
 72
 MIKVA, Circuit Judge, with whom Circuit Judges ROBINSON and EDWARDS join, dissenting :
 
 
 73
 In the seven years since the Federal Energy Regulatory Commission (FERC) determined, with apparent finality, that the municipal preference embodied in the Federal Power Act, 15 U.S.C. Sec. 791a et seq. (1982), applies to relicensing proceedings, this case has been beset by an unusual and extended series of twists and turns, confounding the parties as well as this court. In permitting FERC to overrule its prior holding and apply its new interpretation retroactively to petitioner Clark-Cowlitz Joint Operating Agency (Clark-Cowlitz), this court today adds its own contribution to the tortuous unfolding of this case. The majority's conclusions are marred at every step by skewed articulation of the facts and warped application of the law. The court today manages in one opinion to do violence to principles of preclusion, retroactivity, and statutory interpretation. I dissent.
 
 I.
 
 74
 A. Retroactivity Doctrine and Administrative Adjudications
 
 
 75
 The largest part of the court's opinion is devoted to its finding that FERC's application of its reversal of field to the parties in Pacific Power & Light Co., 25 F.E.R.C. (CCH) p 61,052, reh'g denied, 25 F.E.R.C. (CCH) p 61,290 (1983) ("Merwin"), was consistent with principles of retroactivity. The court begins its analysis by citing a "general principle" that retroactive application of a new interpretation announced in an agency adjudication is favored, and prospective application is permissible only if necessary to avoid a "manifest injustice." Majority opinion (Maj. op.) at 1081. There is no such general principle under the law. Courts reviewing an agency's attempt to retroactively apply a new policy announced in an administrative adjudication must make an independent determination whether "the inequity of retroactive application [is] counterbalanced by sufficiently significant statutory interests." Retail, Wholesale & Dep't Store Union v. NLRB, 466 F.2d 380, 390 (D.C.Cir.1972). This determination incorporates neither a presumption of retroactive application nor a presumption of prospective application. Rather, as the Supreme Court has made clear, it involves a straight-word balancing test in which the ill effect of retroactive application is weighed against the damage to the statutory design caused by prospective application. See SEC v. Chenery, 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947). It is highly inappropriate for this court to transform this test by adjusting the scales in favor of retroactive application. Moreover, the "manifest injustice" test to which the court refers comes from Thorpe v. Housing Authority of the City of Durham, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), a case that is completely inapposite. In Thorpe, the Court found that it would not be manifestly unjust for the agency to apply a new standard that already had been established at the time of the proceeding. The equities are far sharper, and the legal test quite different, when an agency seeks to apply a new standard to the parties to the very adjudication in which the reversal is announced.
 
 
 76
 As the majority recognizes, the seminal case fixing the law of the circuit for retroactive application of agency adjudications is Retail, Wholesale & Dep't Store Union v. NLRB, 466 F.2d 380 (D.C.Cir.1972). In Retail, Wholesale, this court refused to give retroactive effect to a new rule adopted in the course of a National Labor Relations Board adjudication. The court listed five factors which courts must put into the balance in determining whether a decision should have retroactive effect:
 
 
 77
 (1)whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.
 
 
 78
 Retail, Wholesale, 466 F.2d at 390. These considerations provide in the context of agency adjudication a way to attend to the principal concerns of retroactivity analysis--"lack of notice and the degree of reliance on former standards." Id. at 390 n. 22. The Retail, Wholesale test attempts to reconcile the interests of the litigants with the overall public interest in effectuation of a statutory scheme: retroactive application is appropriate only if the court is satisfied that the prejudice to parties who justifiably relied on the previous standard is outweighed by the need to advance the statutory purpose which the new rule will serve. See McDonald v. Watt, 653 F.2d 1035, 1045 (5th Cir.1981); Sierra Club v. EPA, 719 F.2d 436, 468 (D.C.Cir.1983).
 
 
 79
 The Retail, Wholesale test is specifically adapted to the unique circumstances of agency attempts to retroactively apply a new policy announced in an administrative adjudication. Although the principles of retroactive application of judicial decisions serve as a general guide in the context of administrative adjudications, 4 K. Davis, Treatise on Administrative Law Sec. 20.7, at 23 (2d ed. 1983); see Daughters of Miriam Center for the Aged v. Matthews, 590 F.2d 1250, 1259 (3rd Cir.1978), analysis of administrative decisions is colored by agencies' ability to announce new policy via either adjudication or rulemaking. On the one hand, the agency needs and enjoys considerable discretion in choosing which vehicle is the more appropriate for formulating new standards in a given case. See SEC v. Chenery Corp., 332 U.S. 194, 202-03, 67 S.Ct. at 1580 (1947). On the other hand, this flexibility means that an agency is less justified in relying upon adjudication to impose new standards of conduct retroactively, because the agency, unlike courts, has the option to promulgate a rule prospectively and thereby avoid imposing burdens on parties who have relied on the prior standard. See NLRB v. Majestic Weaving Co., 355 F.2d 854, 860 (2d Cir.1966) (Friendly, J.); Bonfield, The Federal APA and State Administrative Law, 72 Va.L.R. 297, 330 (1986).
 
 
 80
 Several additional principles emerge from cases in which this court has reviewed agency decisions applying a new standard retroactively. First, whether a new standard should be applied is a question of law. Agencies possess no particular expertise on the issue of retroactivity, and reviewing courts in turn have "no overriding obligation of deference" to an agency's decision to give retroactive effect to a new rule. Retail, Wholesale, 466 F.2d at 390. Second, agency decisions to apply an order retroactively must be the product of rational analysis, and "the law requires that an agency explain ... how it determined that the balancing of the harms and benefits favors giving a change in policy retroactive application." Yakima Valley Cablevision, Inc. v. FCC, 794 F.2d 737, 746 (D.C.Cir.1986). Third, an agency's failure to consider the less drastic alternative of prospective application may be considered arbitrary and capricious and thus constitute grounds for reversal. Id.
 
 B. Application
 
 81
 Applying the Retail, Wholesale test to the facts of this case compels the conclusion that FERC should not have applied its reversal of policy to Clark-Cowlitz. The first Retail, Wholesale factor--whether the particular rule is one of first impression--is anchored in a recognition that "the problem of retroactive application has a somewhat different aspect in cases not of first but of second impression, where an agency alters an established rule defining permissible conduct which has been generally recognized and relied on throughout the industry that it regulates." NLRB v. Majestic Weaving Co., 355 F.2d 854, 860 (2d Cir.1966); see Retail, Wholesale, 466 F.2d at 390. Thus, when an agency already has considered the issue and established a firm rule, a court is more likely to require prospective application of the agency's reinterpretation. We have here a classic example of a case of second impression. As the majority observes, see Maj. op. at 1076, three years before the orders under review, the Commission convened a special declaratory proceeding for the explicit purpose of resolving the municipal preference issue. It then adopted a clearcut interpretation of section 7(a), and ordered the parties to proceed on the basis of that interpretation. This factor thus weighs squarely on the side of prospective application.
 
 
 82
 The majority concludes that "inasmuch as Merwin was the first proceeding in which FERC announced its reinterpretation, the first Retail, Wholesale factor points in favor of retroactive application." Maj. op. at 1082. This conclusion is, simply put, baffling. The majority flatly misinterprets the use of the term "first impression" in Retail, Wholesale. Of course Merwin was the first proceeding in which FERC announced its reversal; retroactivity analysis assumes that the decision at issue changed the law. See Retail, Wholesale, 466 F.2d at 389 (retroactivity analysis permits courts to determine whether to grant or deny retroactive force to newly established rules). Thus, the first factor does not look to whether the very decision at issue had ever been articulated before; such an inquiry would make the first factor meaningless. Rather, the court was inquiring whether the agency had previously decided the underlying issue and was now seeking to depart from its previous resolution. Moreover, the court cited the very language from the Supreme Court's opinion in Chenery which the majority concedes contains "the more typical understanding of the term [first impression] as referring to situations in which an agency confronts an issue that it has not resolved before." Maj. op. at 1082 n. 6. Finally, the court in Retail, Wholesale noted that it was reviewing "not a case of first, but of second impression." Retail, Wholesale, 466 F.2d at 390 (emphasis added). The majority thus has indulged in a tendentious and utterly fanciful rewriting of this part of the Retail, Wholesale opinion.
 
 
 83
 The second Retail, Wholesale factor requires the court to determine "whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law." Retail, Wholesale, 466 F.2d at 390. If the new rule falls into the former category rather than the latter, it impinges on the "principal concern of [retroactivity analysis]--lack of notice and the degree of reliance on former standards." Id. n. 22. The Commission's about-face in Merwin falls more naturally into the first category rather than the second. Unlike the agency in Chenery, in which retroactive application was allowed, FERC was not "filling in the interstices of the Act." 332 U.S. at 202, 67 S.Ct. at 1580. Rather, as in Retail, Wholesale, in which retroactive application was refused, it was announcing a 180-degree turnaround from a prior clear standard. See Retail, Wholesale, 466 F.2d at 391. The Commission previously had given careful consideration to the issue--conducting an unprecedented full day of oral argument--and then determined unanimously that the municipal preference applies to relicensing proceedings. The majority points out that only three years elapsed in this case between the agency's initial determination and its subsequent reversal, whereas the interval in Retail, Wholesale was seven years. Besides the fact that the difference in intervals is hardly dramatic, the majority's position falsely equates "well established" with "longstanding." The firmness of a precedent may, but need not, be connected to its longstandingness. Indeed, the majority's assumption that more recent precedent is somehow "soft" is inimical to the rule of law. In this case, the question had been conclusively settled when the Commission announced a sudden and complete reversal of field. Thus, the second factor also cuts in favor of prospective application.
 
 
 84
 The third Retail, Wholesale factor is the extent of Clark-Cowlitz's reliance on the Commission's decision in City of Bountiful, Utah, 11 F.E.R.C. (CCH) p 61,337 (June 27, 1980), reh'g denied, 12 F.E.R.C. (CCH) p 61,179 (Aug. 21, 1980) ("Bountiful "). This third factor also counsels in favor of prospective application. The majority concludes that Clark-Cowlitz could only have reasonably relied on the prior interpretation until May of 1983, when the Solicitor General revealed FERC's dissatisfaction with the result in Bountiful. Such a degree of reliance admittedly would be modest, although not impalpable. However, Clark-Cowlitz's reliance reasonably extended considerably beyond May of 1983. To see why this is so, it is necessary to fill in somewhat the majority's statement of facts, which omits a few critical details that demonstrate that Clark-Cowlitz's reasonable reliance on the Bountiful decision was significant.
 
 
 85
 In its unanimous decision in Bountiful, the Commission included an order that all pending relicensing applications "go forward in light of this declaratory order." 11 F.E.R.C. (CCH) p 61,337 at 61,736. In accord with the Commission's directive, Clark-Cowlitz filed in October of 1980 the first of two motions requesting a hearing on the Merwin license. The Commission also specifically declined to postpone the hearing pending judicial review of Bountiful. See J.A. 289. Thus, although the majority discounts them, Clark-Cowlitz's preliminary efforts after the successful resolution of Bountiful were certainly in reasonable reliance on (indeed, mandated by) the Bountiful decision, and in fact they enabled Clark-Cowlitz to become the first (and, given subsequent events, the only) municipal applicant to proceed to a hearing in a competitive relicensing proceeding.
 
 
 86
 Three days after the decision of the Eleventh Circuit (before whom the Commission strenuously and successfully defended its position in Bountiful ), the Merwin hearing convened. Both parties agreed that the municipal preference applied to the Merwin proceeding and focused only on the remaining statutory issue under 7(a)--whether the two entities were "equally well adapted to conserve and utilize the water resources of the region." Joint Statement of Major Contested Issues, reprinted in J.A., at 298-300. Clark-Cowlitz's efforts at this hearing therefore also were taken in reliance on Bountiful. The Administrative Law Judge concluded that the two applicants were equally well adapted to conserve and utilize the region's water resources. He therefore applied the municipal preference and entered an order awarding the license to Clark-Cowlitz. Pacific Power immediately appealed to the Commission on the ground that it was the superior candidate and therefore deserved the license notwithstanding the municipal preference.
 
 
 87
 To this point the Merwin controversy had been an unremarkable outgrowth of the Commission's original decision in Bountiful; with Clark-Cowlitz having gone a fair way towards securing the license, however, the case began to take on unusual convolutions. The Commission had undergone a substantial change in personnel following the 1980 election. Three days before the ALJ's decision in Merwin, the reconstituted Commission met in secret session. See Clark-Cowlitz Joint Operating Agency v. FERC, 798 F.2d 499 (D.C.Cir.1986). As the Commission later revealed, at that closed meeting a majority of the Commissioners registered disagreement with their predecessors' decision in Bountiful. They voted to ask the Solicitor General to recommend that the Supreme Court grant the private utilities' pending petitions for certiorari and remand the case to the Commission. See Brief for the Federal Energy Regulatory Commission on Petitions for a Writ of Certiorari at 8, Utah Power & Light Co. v. FERC, 463 U.S. 1230, 103 S.Ct. 3573, 77 L.Ed.2d 1415 (1983), reprinted in J.A. 106, at 107. A principal reason for this request was the Commission's conviction that if certiorari were denied, the Bountiful decision would be binding as to applicants who participated in Bountiful under principles of res judicata. See id., J.A. at 106-07. The Solicitor did not comply precisely with the Commission's request. Instead, he urged the Supreme Court to remand the case to the Eleventh Circuit for reconsideration in light of "intervening circumstances"--to wit, the fact that "a majority of the Commissioners, four of whom were appointed after the issuance of [Bountiful ], expressed their disagreement with the Commission's earlier position in these orders." Id., J.A. at 106. The Supreme Court, however, denied certiorari. See Utah Power & Light Co. v. FERC, 463 U.S. 1230, 103 S.Ct. 3573, 77 L.Ed.2d 1415 (1983).
 
 
 88
 The denial of certiorari might have appeared to quiet any potential argument against granting Clark-Cowlitz a license to operate the Merwin Project. A majority of the Commission, however, decided to continue to pursue its opposition to the municipal preference. In its review of the ALJ's decision in Merwin, the Commission, in a 3-2 decision, simply overruled Bountiful. 25 F.E.R.C. (CCH) p 61,052 (Oct. 7, 1983). Although the majority obscures this vital fact, the Commission's volte-face was completely unforeshadowed: the Bountiful interpretation had never been challenged during the course of the Merwin litigation, the parties had not briefed it, and the Commission had given no indication that the issue might even be open for reconsideration.
 
 
 89
 The above scenario differs materially from that obtaining in other proceedings in which a rule is changed. Normally parties will be on notice that the previous interpretation is subject to revision in that proceeding; any reliance on the old standard in the party's litigation efforts therefore would be unreasonable. Here, however, the parties had no notice that FERC considered Bountiful to be open for reconsideration in Merwin and thus reasonably proceeded on the assumption that the municipal preference applied. Moreover, the Commission's request for certiorari only made it more reasonable to rely on Bountiful, because the Commission had indicated that the municipal preference certainly would apply to pending relicensing proceedings if the Court denied the application, as it did. Thus, under the unusual facts of this case, Clark-Cowlitz's efforts during the course of the Merwin proceeding must also be counted as part of its reasonable reliance on the Commission's decision in Bountiful.
 
 
 90
 In the three years between the Commission's proclamations in Bountiful and Merwin, Clark-Cowlitz relied on the established standard to a degree unique among the many municipal suitors for expiring licenses. Clark-Cowlitz was the only municipal applicant to proceed to hearing in a competitive relicensing proceeding. The municipality's efforts to get the Commission to schedule a hearing, as well as the two-year course of the Merwin proceeding, entailed a substantial outlay of time and money. Clark-Cowlitz participated in voluminous discovery, engaged experts in several fields, prepared memoranda and four briefs (none of which addressed the supposedly settled municipal preference issue), and presented its case in prehearing conferences and the actual hearing before the ALJ. This reliance was significant, especially for a municipal applicant of limited resources. The third Retail, Wholesale factor therefore cuts distinctly in favor of prospective application.
 
 
 91
 The degree of burden which the retroactive order imposes on Clark-Cowlitz, the fourth Retail, Wholesale factor, also counsels in favor of prospective application. Clark-Cowlitz is a municipal corporation formed for the express purpose of seeking the Merwin license. Deprivation of that license--the effect of applying the Commission's order retroactively--is therefore quite a severe hardship for the municipality. It thwarts the single purpose which is quite literally Clark-Cowlitz's raison d'etre.
 
 
 92
 The first four factors, which gauge the litigants' personal interest in not being judged under a newly announced standard, thus present a fairly compelling case for prospective application. Although there is room for reasonable disagreement as to the force of some of these factors in the instant case, the important point, which the majority fails to recognize, is that whatever the impact of the first four factors, retroactive application is appropriate only if the court finds that the first four factors are counterbalanced by the fifth factor--the statutory interest in applying a new rule. "Unless the burden of imposing the new standard is de minimis, or the newly discovered statutory design compels its retroactive application, the principles which underlie the very notion of an ordered society, in which authoritatively established rules of conduct may fairly be relied upon, must preclude its retroactive effect." Retail, Wholesale, 366 F.2d at 392. See id. at 390 ("courts have not infrequently declined to enforce administrative orders when in their view the inequity of retroactive application has not been counterbalanced by sufficiently significant statutory interests."); see also Sierra Club v. EPA, 719 F.2d 436, 468 (D.C.Cir.1983), cert. denied, 468 U.S. 1204, 104 S.Ct. 3571, 82 L.Ed.2d 870 (1984) ("The statutory interest in applying the new rule despite individual reliance is, of course, the crucial consideration in the context of requiring an agency to apply one of its rules retroactively."). In this case, the majority makes no such finding, nor could it, because there is no statutory interest in retroactive application.
 
 
 93
 Normally, of course, assuming a new interpretation is not unfaithful to the statutory scheme, there will be some statutory interest in retroactive application, and the court must weigh that interest against the ill effects of retroactivity. See Chenery, 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 95 L.Ed. 1995 (1947). In this respect, however, as in so many others, this case is a true rara avis. The current statutory scheme specifically disavows any interest in denying Clark-Cowlitz the benefit of the municipal preference. With the Electric Consumers' Protection Act, Congress has amended the Federal Power Act so as to remove the municipal preference from all pending relicensing proceedings with one explicit exception: the Merwin project. See 100 Stat. 1243 Sec. 11. Congress has pointedly informed us, with truly unusual specificity, that it has no preference one way or the other as to whether Clark-Cowlitz receives the benefit of the municipal preference. Thus, retroactive application of the Commission's decision in Merwin could not possibly advance any statutory benefit to offset the considerable harm it would do to Clark-Cowlitz. Cf. Mullins v. Andrus, 664 F.2d 297, 304 (D.C.Cir.1980) (no statutory objectives to be served where new statutory machinery is in place). Moreover, in this respect, as in respect to its degree of reliance, Clark-Cowlitz is unique among the many municipalities that participated in Bountiful.
 
 
 94
 The majority nevertheless concludes that there is a statutory interest in retroactive application. The majority reasons that, "[w]ithholding retroactive application would grant Clark-Cowlitz a 30-year benefit to which FERC now believes it is not entitled. The overriding Congressional interest in ensuring that the best qualified contestant (as FERC sees it ) operate hydroelectric power projects, in other words, would not be fulfilled at the Merwin site for three decades." Maj. op. at 1085 (emphasis added). But this no more than restates FERC's decision adverse to Clark-Cowlitz. It in no way speaks to Congress' interest in having the new standard apply retroactively to Clark-Cowlitz. If the agency can simply reiterate its decision on the merits as the statutory interest in retroactive application, then the fifth Retail, Wholesale factor is meaningless. In fact, it is our province to determine whether retroactive application advances the statutory interest and in this case there is an extraordinarily clear answer in the text of the amended Federal Power Act: retroactive application of FERC's interpretation in no way advances Congress' statutory design.
 
 
 95
 Finally, it must be noted that the majority is not deferring to the Commission's reasoning for applying Merwin retroactively. The Commission offered no reasoning at all. It simply applied its unanticipated reversal to Clark-Cowlitz without giving any consideration whatsoever to prospective application. Indeed, the Commission gave no thought to prospective application even though it determined to overrule Bountiful "so that the correct preference provision will be applied in future relicensing proceedings." Merwin, 25 F.E.R.C. p 61,052, at 61,177 (emphasis added). In supplying reasoning for the Commission, the majority completely ignores that "the law requires that an agency explain ... how it determined that the balancing of harms and benefits favors giving a change in policy retroactive application." Yakima Valley Cablevision, Inc. v. FCC, 794 F.2d 737, 746 (D.C.Cir.1986). The court at the very least should reverse and remand to the agency for an explanation of its decision. On this ground alone, today's decision is manifestly unjust.
 
 
 96
 In sum, this is a case in which "the prospectivity side of the scale [is] full and the retroactivity side empty." McDonald v. Watt, 653 F.2d 1035, 1046 (5th Cir.1981). Moreover, the Commission did absolutely nothing to fulfill its legal obligation to explain why it opted for retroactive application. Under such circumstances, the Commission's application of its new interpretation to Clark-Cowlitz can only be adjudged to be the type of retroactivity which is condemned by law.
 
 
 97
 The majority also rejects Clark-Cowlitz's argument that principles of collateral estoppel dictate that it have the benefit of the municipal preference in the competition for the Merwin license. My objection to this section of the majority opinion is less with its conclusions than with its premises. In deciding that FERC did not become bound to apply the municipal preference by virtue of the Eleventh Circuit's decision in Alabama Power v. FERC, 685 F.2d 1311 (11th Cir.1982), cert. denied, 463 U.S. 1230, 103 S.Ct. 3573, 77 L.Ed.2d 1415 (1983), the court is attacking a paper tiger. The more important and interesting issue for purposes of preclusion doctrine is whether Pacific Power & Light is precluded from reaping the benefit of FERC's volte-face by virtue of FERC's decision in Bountiful. I conclude that Pacific Power & Light is so precluded and that Clark-Cowlitz, having once successfully litigated the municipal preference issue with respect to its pending application for the Merwin license, cannot now be denied the fruits of its earlier victory.
 
 
 98
 The guiding principle for application of preclusion doctrine to agency adjudications is that "res judicata applies when what the agency does resembles what a trial court does. Such a resemblance or lack of it applies to determinations of law as well as to determinations of fact." K. Davis, 4 Administrative Law Treatise 52 (2d ed. 1983). Bountiful, it will be remembered, was a separate declaratory proceeding that progressed to final judgment. If the Bountiful declaratory proceeding had taken place in federal court, as it certainly could have, the litigants would be bound by the ultimate determination that the municipal preference applies in relicensing proceedings. That is not to say that a court--or in this case FERC--could not later, subject to the principles of stare decisis, decide to adopt the opposite view. But such a subsequent revision could not change the original outcome as to the original parties. If parties' fates could be so put at the mercy of subsequent revision, it would decimate the policies that preclusion doctrine is designed to advance: protection from the vexation and expense of repetitious litigation, promotion of confidence in the conclusiveness of decisions, and, especially, securing of peace and repose of society. Thus, while FERC may be entitled to change its interpretation of the Federal Power Act, its ability to revise its view does not extend to undoing the preclusive effect of a declaratory order resolving a ripe controversy.
 
 
 99
 As the majority points out, underlying the rule of issue preclusion is the principle that "one who has actually litigated an issue should not be allowed to relitigate it." Restatement (Second) of Judgments 6 (1982). Yet Clark-Cowlitz and Pacific Power & Light did actually litigate the municipal preference issue in Bountiful. Clark-Cowlitz and Pacific Power & Light were competitors in a pending relicensing hearing that was suspended to resolve the municipal preference issue in a declaratory proceeding. The two parties litigated vigorously--all the way to the Supreme Court--with the reasonable expectation it would resolve the crucial issue in their ongoing controversy. Thus, Clark-Cowlitz and Pacific Power & Light have been afforded an adequate opportunity to litigate a ripe claim before an administrative tribunal. This court therefore does violence to the principles underlying preclusion doctrine by permitting Pacific Power & Light not to be bound by the decision in Bountiful.
 
 
 100
 The majority argues in one of its footnotes that preclusion should not apply because it was FERC, and not Pacific Power, that changed its position:
 
 
 101
 Thus, to the extent preclusion analysis is appropriate at all, it is applicable to the extent that FERC participated as a party before the Eleventh Circuit.
 
 
 102
 Maj. Op. at 1080 n. 5. FERC is the named party in the Eleventh Circuit proceedings and participated fully as it had to do. The issue of municipal preference went to final judgment, and certiorari was denied. Everybody, including FERC, Pacific Power and Clark-Cowlitz, assumed that with the denial of certiorari the issue of municipal preference was finally resolved as to Clark-Cowlitz. The majority's effort to rebut this point raises sophistry to a new pinnacle--surpassed only by the alternative position advanced by the court to justify in general the curious procedures of FERC. If we allowed preclusion, says the court, it would benefit Clark-Cowlitz over the other municipalities that participated in Bountiful --and burden Pacific Power over the other utilities involved in Bountiful. The court even cites the reason for such disparity, but gives it no weight: the passage by Congress of a law which specifically put Clark-Cowlitz and Pacific Power in a category separate from the other parties. It is appropriate that such a rebuttal to the dissent's concerns is expressed in a footnote.
 
 
 103
 The court's decision also will greatly undermine parties' confidence in the valuable tool of administrative declaratory proceedings. See 5 U.S.C. Sec. 554(e) (1982). Henceforth, parties will be justifiably concerned that such proceedings, even of the scope and effort that characterized Bountiful, may in fact be mere dress rehearsals whose result as to the parties is subject to complete reversal in a subsequent adjudication. The court's result thus works a substantial disservice to both preclusion doctrine and administrative law.
 
 II.
 
 104
 The question of the merits of FERC's reinterpretation of the Federal Power Act has been rendered virtually academic by virtue of the Electric Consumer Protection Act of 1986, Pub.L. No. 99-495, 100 Stat. 1243. While carefully excepting the controversy at bar from its provision, Congress now has provided that the municipal preference will not apply to future relicensing proceedings. The majority's analysis of the unamended Federal Power Act, however, suffers from two flaws so substantial that I must dissent from that portion of the opinion as well.
 
 
 105
 First, in upholding FERC's new interpretation, the majority relies heavily on the distinctions between entertaining applications for a license--i.e., the process of selecting a licensee--and the process of actually issuing a license. The majority suggests that section 7(a) of the Act must be read to refer to the latter process in order to give full meaning to the statute. In fact, such a reading leaves the statute meaningless. The municipal preference obviously is intended to be used in the decision-making process as a tiebreaking device to select one licensee from among equally well-adapted candidates. It makes no sense to say that FERC can first decide to whom to award a license and then apply the municipal preference to the formal act of issuing the license. The municipal preference must come into play in determining which candidate wins the competition, not in awarding the prize. The majority's analysis on this point is untenable.
 
 
 106
 The second flaw in the majority's review comes in its determination that the Merwin proceeding arose under the second half of section 7(a)--the "as between other applicants" clause. The majority already has detailed one problem with its interpretation: the second clause of 7(a) refers to "other applicants." The obvious meaning of this phrase is "applicants other than municipal entities," and Clark-Cowlitz is a municipal entity. But there is a more subtle, although no less significant, problem with the majority's analysis. A careful reading of section 7(a) demonstrates that a proceeding cannot arise under the second half of that provision. Section 7(a) first specifies three situations to which it pertains. It then instructs FERC how to proceed in any of these situations, depending on the identity of the applicants. Those instructions are: 1) if an equally well-adapted state or municipality is among the applicants, award it the license; 2) as between other applicants, the Commission may give preference to the best-adapted candidate as defined in the clause. In short, the "as between other applicants" clause refers back to the three situations section 7(a) addresses; it is not a general catch-all clause designed to cover any and all other situations. Thus, FERC's decision to rely on the "as between other applicants" clause as a separate jurisdictional provision, and the court's deference to that decision, are at odds with Congress' statutory scheme.
 
 III.
 
 107
 The rule of law is premised on a concept of reliance. Courts and policymakers have struggled to give full measure to that concept, while recognizing that the results are not always comfortable for society. Retroactivity conflicts are particularly acute when an administrative agency seeks to balance the need for flexibility and change in the administrative law sector with the parties' right to rely on what the agency has said and done previously. Here FERC generated considerable reliance on a rule it then proceeded to reverse without notice. The retroactive application of its new standard to Clark-Cowlitz was unlawful and unreasoned. It also violated well-established principles of preclusion doctrine. Finally, it was premised on a statutory interpretation that at least in some respects was unreasonable. Although Congress' recent amendment to the Federal Power Act has greatly diminished the scope of the dispute, the court today works a grave disservice to the one municipal applicant who still has a right, preserved by statute, to have its application decided under FERC's prior interpretation.
 
 
 108
 I dissent.
 
 
 
 *
 Judge (now Justice) Scalia was a member of the Court at the time this case was argued, but did not participate in this opinion
 
 
 **
 Senior Circuit Judge Wright participated in oral argument of this case, but subsequently recused himself from further participation
 
 
 [1]
 Section 7(a) provides as follows:
 In issuing preliminary permits hereunder or licenses where no preliminary permit has been issued and in issuing licenses to new licensees under section 808 of this title the Commission shall give preference to applications therefor by States and municipalities, provided the plans for the same are deemed by the Commission equally well adapted, or shall within a reasonable time to be fixed by the Commission be made equally well adapted, to conserve and utilize in the public interest the water resources of the region; and as between other applicants, the Commission may give preference to the applicant the plans of which it finds and determines are best adapted to develop, conserve, and utilize in the public interest the water resources of the region, if it be satisfied as to the ability of the applicant to carry out such plans.
 16 U.S.C. Sec. 800(a) (1982). The parties do not dispute that Clark-Cowlitz is a "municipality" for purposes of section 7(a). See id. Sec. 796(7).
 
 
 [2]
 The court canvassed the legislative history and concluded that it contained only "weak" support for FERC's position (that the preference applied in all relicensings, even those in which the incumbent licensee was seeking to obtain a new license for the project). Alabama Power, 685 F.2d at 1317. Nonetheless, it accepted FERC's assertion that its interpretation accorded with the language and structure of the statute. At the same time, it acknowledged that the contrary reading proffered by the private utilities (that the preference was inapplicable in relicensings that involved the incumbent) was also "a reasonable interpretation" of the language and structure. Id. at 1316. The court went on to opine in dicta, however, that this reading would lead to "absurd results." Id. at 1316-17. Specifically, it believed that the alternative interpretation championed by the private utilities gave incumbents an undue advantage and left the Commission with no "tie-breaking" preference to apply in certain situations. Id. But cf. Pacific Power & Light Co., 25 F.E.R.C. p 61,052, at 61,184-85 (1983) (asserting that no such absurd result obtained under this interpretation)
 
 
 [3]
 Section 2 of the 1986 Act amends section 7(a) of the Federal Power Act, quoted in full supra note 1, so that 7(a) now begins as follows:
 In issuing preliminary permits hereunder or original licenses where no preliminary permit has been issued, [and in issuing licenses to new licensees under section 808 of the title] the Commission shall....
 ECPA, Sec. 2, 100 Stat. 1243 (additions italicized; deletions bracketed). Section 11 of the ECPA provides in relevant part:
 The amendments made by this Act ... shall not apply to the Federal Energy Regulatory Commission proceeding involving FERC Project Number 935 (FERC Project Number 2791), relating to the Merwin Dam in Washington State.
 Id. Sec. 11.
 
 
 [4]
 It is irrelevant to preclusion analysis that in dicta the Eleventh Circuit suggested that the interpretation now taken by FERC would lead to absurd results. See supra note 2. Preclusion attaches only to issues the resolution of which is necessary to support the judgment in the first action. See, e.g., Synanon Church v. United States, 820 F.2d 421, 424 (D.C.Cir.1987); Jack Faucett Assocs., 744 F.2d at 125; Association of Bituminous Contractors, Inc. v. Andrus, 581 F.2d 853, 860 (D.C.Cir.1978); 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 4421 (1981). Under the deferential standard of review employed by the reviewing court, it had only to determine the reasonableness of FERC's prior interpretation, not the correctness of competing interpretations. The same reasoning applies if we treat Clark-Cowlitz's argument in terms of claim preclusion. The present "claim"--that FERC's present interpretation of section 7(a) is incorrect--could not have been entertained by the Eleventh Circuit before FERC adopted this interpretation. Cf. I.A.M. National Pension Fund, 723 F.2d at 947-49
 
 
 [5]
 The dissent's argument that the real issue of preclusion is whether Pacific Power should be bound by Bountiful is, with all respect, misguided. It is true as a general matter that preclusion principles can apply to parties to administrative proceedings, but that principle is irrelevant here. The doctrine of preclusion is meant to prevent parties from rearguing issues they have already lost. But Pacific Power has never argued that Bountiful did not apply to it. It was the decisionmaker, FERC, that changed its position. Thus, to the extent preclusion analysis is appropriate at all, it is applicable to the extent that FERC participated as a party before the Eleventh Circuit. Preclusion principles are meant to provide an affirmative defense that one party to a prior proceeding may raise against another party that took an adverse position in that proceeding
 Assuming arguendo the appropriateness of addressing whether Pacific Power should be precluded by virtue of its participation, we would reach the same conclusion. Bountiful was, it must be remembered, a declaratory order proceeding, see 5 U.S.C. Sec. 554(e), and as such was structured expressly in order to address a pure issue of law: the applicability of the municipal preference of section 7(a) to relicensing. See Bountiful, 11 F.E.R.C. at 61,710. It is well settled that the determination of an issue of law should not be accorded preclusive effect if such effect would result in "inequitable administration of the law." See Restatement (Second) of Judgments Sec. 28(a); see also Staten Island Rapid Transit Operating Auth. v. ICC, 718 F.2d 533, 542 (2d Cir.1983). We think that would be the precise consequence of applying preclusion in this case for the reason we discuss infra section III. It would grant Clark-Cowlitz a benefit which similarly situated parties--namely, the numerous other municipalities who participated in Bountiful--would be denied by virtue of passage of the Electric Consumers Protection Act. Correlatively, it would burden a party, Pacific Power, in a way that similarly situated parties--namely, the numerous private utilities in Bountiful--would not be burdened.
 Moreover, the dissent's attempt to equate Bountiful with ordinary federal court proceedings ignores the fact that administrative proceedings vary much more widely than judicial proceedings. Since as a general matter preclusion principles are to be applied more flexibly to administrative adjudications than to judicial proceedings, see generally Restatement (Second) of Judgments Sec. 83; 4 K. Davis Sec. 21:9, withholding preclusive effect as to a single party is especially justified in light of the unique nature of the Bountiful proceedings and the scope of participation in those proceedings by private parties.
 
 
 [6]
 The Retail, Wholesale court somewhat misleadingly refers to this first factor as an inquiry whether the agency adjudication at issue is one of "first impression." This nomenclature contains within it seeds of confusion, insofar as it differs from the more typical understanding of the term as referring to situations in which an agency confronts an issue that it has not resolved before. See, e.g., SEC v. Chenery, 332 U.S. 194, 202-03, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947). Nonetheless, this potential confusion is quickly dispelled upon examination of the facts of Retail, Wholesale. There the Retail, Wholesale court labeled the case before it one of second impression and on that basis distinguished it from the agency decision, The Laidlaw Corporation, 171 NLRB No. 175 (June 13, 1968), in which the NLRB first overruled a well-established rule to the contrary. In discerning this distinction, the court clearly labelled Laidlaw a case of "first impression" for purposes of analysis under the first factor, even though Laidlaw addressed an issue which the agency had addressed before:
 First, while the Supreme Court has observed in Chenery that "[E]very case of first impression has a retroactive effect ...," this is not a case of first, but of second impression. The case in which the rule in question was adopted by the Board was Laidlaw itself, and, although the Seventh Circuit upheld its application to the employer there, it must be recognized that "[t]he problem of retroactive application has a somewhat different aspect in cases not of first impression but of second impression."
 466 F.2d at 390 (footnotes and citations omitted). It could not be clearer that Laidlaw was not a decision of the sort typically referred to as one of "first impression"--that is, it was not the first time that the NLRB had ever addressed the issue (whether an employer had to seek out affirmatively and offer reinstatement to employees replaced during an unfair labor practice strike). Rather, Laidlaw was one of "first impression" in a different sense, namely that it decided for the first time that employers did in fact have a duty to seek out and offer to reinstate such employees. In announcing this rule, the Laidlaw decision squarely overruled numerous NLRB decisions that had addressed this same issue but reached the opposite result. Id. at 387-88 & n. 17. Thus, the dissent misinterprets the term "first impression" as used in Retail, Wholesale in concluding that Merwin was "a classic example of a case of second impression." Dissent at 1094. Merwin clearly qualifies as a case of first impression under the Retail, Wholesale analysis, which, the dissent acknowledges, is the "seminal case fixing the law of the circuit for retroactive application of agency adjudications." Id. at 1093.
 The dissent goes on to suggest that the first factor of Retail, Wholesale loses meaning if a case enunciating a new rule is viewed as a case of "first impression." Id. at 1094. But the apparent conceptual oddity disappears when one focuses not upon the nomenclature, which is indeed misleading, but on the concept which the Retail, Wholesale court was seeking to convey. And that point was well captured by the court's observation that parties who challenge old doctrines should be rewarded for bringing about the change in the law. That is, to deny the fruits of victory to those who bring about a change in the law "might have adverse effects on the incentive of litigants to advance new theories or to challenge outworn doctrines." Id. at 390. Thus, we are convinced that the dissent, with all respect, has been misled by the admittedly misleading nomenclature employed by the Retail, Wholesale court, and has overlooked the real point--the first factor points in favor of retroactive application of a rule in the adjudication in which the new rule or principle is announced. Odd as it may seem to the dissent, the first factor tends by its nature to cut in favor of retroactive application of a new principle. That factor, however, can obviously be counterbalanced by the weight of the other factors, which boil down, as we shall presently see, to a question of concerns grounded in notions of equity and fairness.
 
 
 [7]
 Consideration of Hanover Shoe, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231, illustrates the fundamental defect in the dissent's analysis of this case under the second Retail, Wholesale factor. In Hanover Shoe, the Court assessed whether "a party ha[d] significantly relied upon a clear and established doctrine" so as to warrant nonretroactive application of a judicially articulated rule concerning the law of monopolization. Id. at 496, 88 S.Ct. at 2223. It surveyed case law extant when the rule was first clearly announced and determined that there was no "sharp break in the line of earlier authority or an avulsive change which caused the current of the law thereafter to flow between new banks." Id. at 499, 88 S.Ct. at 2234. Just as the second Retail, Wholesale factor looks to whether there has been a departure from past practice, 466 F.2d at 390, the Hanover Shoe Court's use of terms like "line of authority" and "current of the law" demonstrates that retroactivity analysis must consider the "longstanding" nature of the displaced prior rule. And that is why a holding of nonretroactivity, as urged by the dissent, cannot be premised on a single, recent agency decision (Bountiful ) that is still in the throes of litigation when it is overruled. It is precisely those situations in which a preexisting rule has withstood the test of time and been faithfully applied or explicitly reaffirmed that justifiable reliance may exist. To this extent, the dissent's suggestion, Dissent at 6, that the three-year interval between Bountiful and Merwin is somehow comparable to the seven years of decisions overruled by the Laidlaw decision at issue in Retail, Wholesale, see supra note 6, is simplistic and misleading. The prior rule at issue in Retail, Wholesale had been applied and confirmed in at least six decisions over those seven years, 466 F.2d at 387 n. 17 (listing cases), five of which held up to judicial review. That is a far cry from the situation here
 
 
 [8]
 In fact, prior to Bountiful, the only indication of how this legal issue would be resolved cut against a municipality's reliance on the availability of the preference. That indication had come in 1967, when the General Counsel of the Federal Power Commission, FERC's predecessor, informed Congress that the FPC interpreted section 7(a) to withhold the municipal preference in relicensing proceedings in which the incumbent licensee was seeking the license. See Bountiful, 11 F.E.R.C. at 61,722-23
 
 
 [9]
 The dissent's attempt to ignore the significance of this disclosure and maintain that the overruling of Bountiful was "completely unforeshadowed," Dissent at 9, blinks at reality. The Solicitor General's certiorari brief clearly and unequivocally foreshadowed Bountiful 's demise when it gave notice to Clark-Cowlitz as well as the Court that "a majority of the [FERC] Commissioners ... expressed their disagreement with the Commission's earlier position [in Bountiful ]" and that "the Commission now wishes to reconsider the case [Bountiful], and ... a majority of the Commissioners appear to be ready to overrule [Bountiful] and adopt the contrary position." Solicitor General's Brief in Support of Certiorari at 8-9, J.A. at 106-07. In light of this clear indication that Bountiful was in mortal danger, it is irrelevant for purposes of gauging reasonable reliance that the Commission, as a litigation matter, expressed concern over the possible binding effect of Bountiful. This latter concern was merely that; it scarcely negates the expression of intent to overrule Bountiful. What is more, this articulated concern must be viewed in its context, namely as part of the Commission's litigation strategy. It cannot be overlooked that at that juncture the Commission was fervently seeking to convince the Supreme Court that the case was worthy of the Court's attention. Thus, assuming arguendo that Clark-Cowlitz expended time and money toward securing a hearing after May 1983 (when the Solicitor General revealed the Commission's forthcoming change in interpretation), that effort simply cannot be said to have been in "reasonable reliance" on the continued vitality of Bountiful. We are thus left with whatever efforts born of optimism may have taken place over six months, which the dissent itself describes as "admittedly ... modest." Dissent at 1095
 
 
 [10]
 For reasons stated in the text, the dissent is wrong to describe the effect of retroactive application as "[d]eprivation of that license," Dissent at 1097, since Clark-Cowlitz still could have received the license if it had been better qualified than Pacific Power. Moreover, the dissent ignores the bedrock fact that Clark-Cowlitz never received a license. All Clark-Cowlitz ever had was a favorable ruling from an ALJ, which was subject to plenary review by the full Commission. Finally, it is worth emphasizing that although Clark-Cowlitz was, as the dissent notes, formed for the express purpose of seeking the Merwin license, its failure to obtain that license was a risk it undertook knowingly; the Authority was formed, after all, when prevailing authority suggested that it was entitled to no preference. See supra note 8
 
 
 [11]
 We are puzzled by the dissent's discounting FERC's view of Congress' interest with respect to hydroelectric relicensings. See Dissent at 1098. FERC did, after all, reach its decision as a result of a careful examination of the relevant statutory framework and legislative history surrounding it; it was not engaging in policy making. We are, of course, obliged when Congress' intent is not clear and unambiguous to defer to an agency's reasonable interpretation of that intent. See Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 844-45, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984); see also INS v. Cardoza-Fonseca, --- U.S. ----, 107 S.Ct. 1207, 1220-21, 94 L.Ed.2d 434 (1987); Clarke v. Securities Indus. Ass'n, --- U.S. ----, 107 S.Ct. 750, 759-60, 93 L.Ed.2d 757 (1987); United States v. Riverside Bayview Homes, 474 U.S. 121, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985); Chemical Mfrs. Ass'n v. Natural Resources Defense Council, 470 U.S. 116, 125, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985). Equally important, Congress' statutory interest in awarding the license to the best qualified applicant, an interest discerned by the Commission in an interpretation that we consider reasonable, see infra section IV, would not be fulfilled at least at the Merwin site for three decades if nonretroactive application of Merwin is required. The need immediately to announce and apply its reinterpretation of Bountiful obviously occurred to FERC, as is evident from the outset of the Merwin decision. FERC acknowledged that "it [did] not matter whether the municipal preference ... [was] applied [to the case before it] because the Commission is in full agreement that the plans of PP & L are better adapted than those of [Clark-Cowlitz] and, consequently, that there [was] no tie." This overruling was obviously necessary because after the round of relicensings then under way, no more adversary relicensings would take place for three decades, as all the parties to Bountiful and Merwin were undoubtedly aware. Since eight of the "future" relicensings were already pending, as FERC noted, if the Commission had decided to postpone announcing its overruling of Bountiful, or to withhold retroactive application, its new interpretation would not be applied to nine different sites for thirty years. The dissent now appears to criticize FERC for not considering singling out Clark-Cowlitz for nonretroactive application of Merwin at the expense of the eight other applicants. See Dissent at 1098. We believe that this was hardly an "obvious alternative," cf. Yakima Valley, 794 F.2d at 746. For one thing, as we discuss in the text, Clark-Cowlitz demonstrated no unique degree of reliance or hardship sufficient to justify such disparate treatment. For another, this alternative was not so "obvious" as to occur to Clark-Cowlitz itself, which argued in its petition for rehearing that FERC was bound to apply Bountiful to all parties to Bountiful, comprising "virtually the entire investor-owned utility industry and a substantial number of publicly-owned utilities." See Clark-Cowlitz's Request for Rehearing of Opinion No. 191, at 10 (Nov. 4, 1983), J.A. at 708, 725; see also id. at 17-19, J.A. at 732-34 (discussing retroactivity principles without suggesting that Clark-Cowlitz should be singled out for favorable treatment)
 
 
 [12]
 We in no way suggest that Congress' most recent legislation controls our decision concerning Clark-Cowlitz's entitlement to the municipal preference. We recognize that in enacting the ECPA Congress deliberately left to this court resolution of the pending controversy involving FERC and Clark-Cowlitz. See, e.g., H.R.Rep. No. 507, 99th Cong., 2d Sess. 16-17 (1986), U.S.Code Cong. & Admin.News 1986, p. 2496; see also supra note 3. We only emphasize that considerations of fairness, which lie at the heart of exceptions to the general rule of retroactivity, militate against treating Clark-Cowlitz differently from the many similarly situated municipalities subject to Congress's enactment
 
 
 [13]
 Section 807(b) provides in relevant part as follows:
 No earlier than five years before the expiration of any license, the Commission shall entertain applications for a new license and decide them in a relicensing proceeding pursuant to the provisions of section 808 of this title....
 16 U.S.C. Sec. 807(b).
 
 
 [14]
 The dissent misreads our opinion "to say that FERC can first decide to whom to award a license and then apply the municipal preference to the formal act of issuing the license," Dissent at 1100. Not so. As FERC reads section 800(a), the municipal preference applies only in relicensing proceedings in which the Commission is "issuing a license to a new licensee," which can only include contests among applicants who are not "original licensees." This reading by the expert agency does not, as the dissent would have it, require application of the preference only after the decision is made as to who gets the award. The Commission obviously knows from the outset whether an original licensee is participating in the proceeding. Employing its misreading of our opinion, the dissent then attempts to justify modifying the language of section 800(a). The dissent would twist the statute so as to trigger the municipal preference in any relicensing proceeding in which a state or municipality has filed an application to become a new licensee--i.e., where the Commission is "entertaining" an application, 16 U.S.C. Sec. 807(b), supra note 13, for the issuance of a license to a new licensee. We believe FERC's contrary interpretation is at least as reasonable as, if not preferable to, an interpretation that requires amending the statute to add language that Congress saw fit to leave out of this provision and chose to use elsewhere, indeed in a neighboring provision. See id
 
 
 [15]
 We need not dwell at length on the dissent's belief that this particular portion of section 7(a), 16 U.S.C. Sec. 800(a), yields an "obvious" meaning. See Dissent at 1100. We think the susceptibility of this provision to varying but reasonable interpretations is suggested by the fact that interpretation of this provision has, so far (1) been the subject of two lengthy and careful Commission decisions reaching contrary results; (2) provided a subject of fierce debate among "virtually the entire" industry, see Clark-Cowlitz's Rehearing Petition, supra note 11, at 10; and (3) led to judicial review by this court sitting en banc with differences of opinion
 As for the "more subtle" problem that the dissent purports to discern in FERC's interpretation of section 7(a), that "problem" is nothing more than a recasting of the dissent's first problem concerning the phrase "as between other applicants," which we acknowledge in the text to be ambiguous. The dissent asserts that "a proceeding cannot arise under the second half of [section 7(a) ]," Dissent at 1100, which is itself a remarkable proposition inasmuch as it appears to deny meaning to fully one-half of the provision. It appears to us that under either of the competing interpretations a relicensing proceeding in which no municipality was involved would require application of the second half of section 7(a). But in any event, in asserting that the first half of section 7(a) covers all possible proceedings, the dissent simply presumes the correctness of its interpretation, namely that "new licensees" includes "original licensees." Such judicial presumptions are not, with all respect, in keeping with Chevron principles.
 
 
 [16]
 The Commission canvassed this lengthy, largely inconclusive history in both Bountiful, 11 F.E.R.C. at 61,712-25 (1980), and Merwin, 25 F.E.R.C. at 61,180-84, J.A. at 620-26
 
 
 [17]
 Section 10(a) of the Federal Power Act provides in relevant part as follows:
 All licenses issued under this subchapter shall be on the following conditions:
 (a) ... That the project adopted ... shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and for beneficial public uses, including recreational purposes....
 16 U.S.C. Sec. 803(a).